## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL HARTLEIB, Derivatively on Behalf of SPRINT NEXTEL CORPORATION,<br><br>              Plaintiff,<br><br>    vs.<br><br>GARY D. FORSEE, PAUL N. SALEH, TIMOTHY E. KELLY, LINDA K. LORIMER, WILLIAM G. ARENDT, BARRY J. WEST, ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, JAMES H. HANCE, JR., V. JANET HILL, and RODNEY O'NEAL,<br><br>              Defendants,<br><br>    -and-<br><br>SPRINT NEXTEL CORPORATION,<br><br>              Nominal Defendant. | Case No  11-CV-1184-EFM-KGG<br><br>**Jury Trial Demanded** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, submits this Verified Shareholder Derivative Complaint in the name and on behalf of nominal defendant Sprint Nextel Corporation ("Sprint" or the "Company") against certain directors and officers of Sprint named herein (the "Defendants"). Plaintiff bases his allegations on personal knowledge as to his own acts and on information and belief as to all other allegations, based upon due investigation by counsel, including:  (a) review and analysis of public filings made by Sprint and other persons with the Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (c) review of news articles, shareholder communications, and postings on Sprint's website concerning the Company's public statements; and (d) review of other publicly available information concerning Sprint and other persons.

## INTRODUCTION AND OVERVIEW

1.      This is a shareholder derivative action brought by a shareholder of Sprint on behalf of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state law, including breaches of fiduciary duties, gross mismanagement, waste of corporate assets, and unjust enrichment, that occurred between October 26, 2006 and February 27, 2008 (the "Relevant Period") and that have caused substantial monetary losses to Sprint and other damages, including damages to its reputation and goodwill.  On behalf of Sprint, this action seeks damages, corporate governance reforms, an accounting, rescission, and the imposition of a constructive trust to remedy Defendants' violations of law.

2.      During the Relevant Period, Defendants caused Sprint to issue or make materially false and misleading statements concerning the Company's business operations and financial condition.  Additionally, Defendants caused Sprint to file materially false and misleading financial statements with the SEC.

3.      In 2005, Sprint was markedly lagging behind wireless leaders AT&T and Verizon.  In a frantic attempt to bolster the Company's competitiveness against AT&T and Verizon, Sprint's Board of Directors, including former CEO, Defendant Gary D. Forsee, decided to purchase Nextel Communications Inc. ("Nextel").  In August 2005, Sprint spent $37.8 billion to purchase Nextel in hopes that combining Sprint's code division multiple access ("CDMA") technology with Nextel's integrated digital enhanced network ("iDEN") would give Sprint the competitive firepower necessary to win market share from its wireless rivals, AT&T and Verizon.  One key aspect of Sprint's plan was to hone in on Nextel's niche in "push to talk," or walkie-talkie technology, the iDEN network.  The combination of Sprint's CDMA and Nextel's "push to talk" iDEN was touted as

capable of achieving merger synergies worth more than the overall purchase amount or greater than $37.8 billion.

4.      After the merger, the merger synergies touted by Defendants never materialized. Instead, Sprint suffered numerous technical, financial, and operational issues.  Through Defendants' failure of oversight, the newly-merged company failed to successfully integrate the CDMA and iDEN systems.  Along with failing to integrate the two technology systems, Defendants also caused Sprint to inherit Nextel's large subprime subscriber base, which quickly caused Sprint's average revenue per use ("ARPU") to drop and increased customer churn rates.

5.      In an attempt to hide these symptoms of a failed merger, the Defendants publicly attributed the drop in ARPU to Sprint's new heightened credit standards and its policy of decreasing reliance on subprime subscribers.  These statements were false and misled shareholders, to the detriment of both them and the Company.

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332. All Defendants are completely diverse from Plaintiff.   The amount in controversy exceeds $75,000.00.

7.      The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion

of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

### A.   Plaintiff

9.     Plaintiff Michael Hartleib is and was during the Relevant Period an owner and holder of Sprint common stock.  For most of the Relevant Period, Mr. Hartleib has owned several hundred thousand dollars' worth of Sprint stock.  He currently holds approximately 11,000 shares.  He is a citizen of California.

### B.   Nominal Defendant

10.     Nominal Defendant Sprint is a corporation organized under the laws of Kansas with its principal place of business in Overland Park, Kansas.

### C.    Defendants

11.     Defendant Gary D. Forsee ("Forsee") was the Chief Executive Officer, and a director, of Sprint until October 2007.  Because of Forsee's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Forsee participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and

Sprint shareholders.  Forsee received $40 million in salary and other compensation from Sprint in 2007—including nearly $14 million in falsely-described "severance" benefits upon his termination. Forsee is a citizen of the District of Columbia.

12.     Defendant Paul N. Saleh ("Saleh") was the Chief Financial Officer of Sprint from 2005 until January 2008 and its Acting Chief Executive Officer during October-December 2007. Because of Saleh's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Saleh participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  In 2008, Saleh received $13.7 million in stock awards and other compensation from Sprint.  He is a citizen of Virginia.

13.     Defendant Timothy E. Kelly ("Kelly") was the Chief Marketing Officer of Sprint from May 2007 to January 2008, and held numerous positions in marketing and customer relations dating back to 2004.  Because of Kelly's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During

the Relevant Period, Kelly participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  In 2008, Kelly received $4.9 million in stock awards and other compensation.  In 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Kelly sold substantially all of his personal holdings of Company stock, garnering an *additional* $1.3 million in ill-gotten gains.  He is a citizen of South Carolina.

14.     Defendant Linda K. Lorimer ("Lorimer") was a member of Sprint's Board of Directors from March 1993 to May 2008, as well as a member of its Audit Committee from 2006 to 2007.  Because of Lorimer's positions, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Lorimer participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  Lorimer personally approved the decision to allow Forsee to be terminated voluntarily, and not "for cause," and to receive approximately $14 million in "severance" benefits.  In 2007, Lorimer received $250,000 in stock awards and other compensation.  In 2006, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Lorimer sold

substantially all of her personal holdings of Company stock, garnering an *additional* $1.1 million in ill-gotten gains.    She is a citizen of Connecticut.

15.    Defendant William G. Arendt ("Arendt") was Sprint's Senior Vice President and Corporate Controller from 2005 to 2008.  He served as Acting Chief Financial Officer for the first half of 2008.  Because of Arendt's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Arendt participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  In 2008, Arendt received $4.1 million in "other compensation" and other compensation.  In 2006 and 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, Arendt sold substantially all of his personal holdings of Company stock, garnering an *additional* $1.2 million in ill-gotten gains.  He is a citizen of Virginia.

16.    Defendant Barry J. West ("West") was the Chief Technology Officer of Sprint from 2005 to 2008.  Because of West's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees

thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, West participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. In 2007, West received $5.8 million in bonuses and other compensation. In 2007, while in the possession of material, non-public information concerning Sprint and its deteriorating financial condition, West sold substantially all of his personal holdings of Company stock, garnering an *additional* $9.1 million in ill-gotten gains. He is a citizen of Florida.

17. Defendant Robert R. Bennett ("Bennett") is a Sprint director and has been since October 2006. He has served on Sprint's Audit Committee since April 2006. Because of Bennett's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Bennett participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Bennett received $224,000 in fees and other compensation from Sprint in 2010. Bennett is a citizen of Colorado.

18. Defendant Gordon M. Bethune ("Bethune") has been a Sprint director since March 2004. Because of Bethune's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public

information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Bethune participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  Bethune received $218,500 in fees and other compensation from Sprint in 2010.  Bethune is a citizen of Texas.

19.     Defendant Larry C. Glasscock ("Glasscock") has been a Sprint director since August 2007.  He has served on Sprint's Audit Committee since April 2007.  Because of Glasscock's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, Glasscock participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  Glasscock received $229,000 in fees and other compensation from Sprint in 2010.  Glasscock is a citizen of Indiana.

20.     Defendant James H. Hance, Jr. ("Hance") is a Sprint director and Chairman of the Board and has been since 2005.  He has served on Sprint's Audit Committee since April 2006.

Because of Hance's positions, he knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith. During the Relevant Period, Hance participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Hance received $375,500 in fees and other compensation from Sprint in 2010. Hance is a citizen of New York.

21.    Defendant V. Janet Hill ("Hill") has been a Sprint director since 2005. Because of Hill's position, she knew, consciously disregarded, was reckless and grossly negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to her in connection therewith. During the Relevant Period, Hill participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders. Hill received $218,583 in fees and other compensation from Sprint in 2010. Hill is a citizen of Virginia.

22.    Defendant Rodney O'Neal ("O'Neal") is a Sprint director and has been since August 2007. Because of O'Neal's position, he knew, consciously disregarded, was reckless and grossly

negligent in not knowing, or should have known the wrongful conduct and adverse, non-public information about the business of Sprint including its finances, markets and present and future business prospects, via access to corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof, as well as reports and other information provided to him in connection therewith.  During the Relevant Period, O'Neal participated in the wrongful conduct and issuance of improper statements, including the preparation of the improper press releases and improper SEC filings and approval of other statements made to the press, security analysts and Sprint shareholders.  O'Neal received $203,000 in fees and other compensation from Sprint in 2010.  O'Neal is a citizen of Michigan.

**D.    Persons Not Named Defendants**

23.    Daniel R. Hesse ("Hesse") is Sprint's President, Chief Executive Officer and, since 2007, a member of its Board of Directors.

24.    Frank Ianna ("Ianna") has been a Sprint director since 2009.  Ianna received $205,167 in fees and other compensation from Sprint in 2010.

25.    Sven-Christer Nilsson ("Nilsson") is a Sprint director and has been since 2008.  Nilsson received $186,000 in fees and other compensation from Sprint in 2009.

26.    Defendant William R. Nuti ("Nuti") is a Sprint director and has been since April 2008.  Nuti received $195,000 in fees and other compensation from Sprint in 2010.

27.    Hesse, Ianna, Nilsson, and Nuti—together with Defendants, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal—are referred to herein as the "Directors."

**GENERAL FIDUCIARY DUTIES OF THE DEFENDANTS**

28.    The Defendants had stringent fiduciary obligations to Sprint and its shareholders.

29.     By reason of their positions as officers, directors and/or fiduciaries of Sprint and because of their ability to control the business and corporate affairs of Sprint, the Defendants owed Sprint and its shareholders fiduciary obligations of loyalty, good faith, due care, disclosure, candor, and oversight, and were and are required to use their utmost ability to control and manage Sprint in a fair, just, honest and equitable manner.  The Defendants were and are required to act in furtherance of the best interests of Sprint and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

30.     Each director and officer of the Company owes to Sprint and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's true intentions regarding Sprint's post-merger activities.

31.     The Defendants, because of their positions of control and authority as directors and/or officers of Sprint, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Sprint, each of the Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Sprint.

32.     At all times relevant hereto, each of the Defendants was the agent of each of the other Defendants and of Sprint, and was at all times acting within the course and scope of such agency.

33.     To discharge their duties, the officers and directors of Sprint were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the

operational affairs of the Company.  By virtue of such duties, the officers and directors of Sprint were required to, among other things:

        (a)      refrain from acting upon material, inside, corporate information to benefit themselves;

        (b)      conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the Company's value;

        (c)      properly and accurately guide shareholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

        (d)      ensure that the Company's financial statements were based on appropriate support and documentation, and were routinely checked for accuracy;

        (e)      ensure that financial records could not be manipulated;

        (f)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

        (g)      ensure that these were sufficient checks and balances in Sprint's accounting and finance functions, and related functions, to prevent accounting irregularities, internal control problems, and/or overstatement of revenue or asset values; and

(h)     ensure that no inaccurate financial information about Sprint was released to the public that would tend to artificially inflate Sprint's stock, and that would thus cause corresponding or greater harm to the Company's value when the truth was revealed.

34.     Each of the Defendants, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, due care, disclosure, candor, and oversight in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sprint, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.  The Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Defendants who collectively comprised all of Sprint's Board during the Relevant Period.

35.     Because of their positions with the Company, and their access to material non-public information available to them but not to the public, Sprint, through the Defendants, knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  As a result of defendant's illegal actions and course of conduct during the Relevant Period, the Company is now subject to class action lawsuits that allege violations of both federal and state law.  As a result, Sprint has expended, and will continue to expend, significant sums of money.

### SPECIFIC FIDUCIARY DUTIES OF DEFENDANTS

**Duties of the Audit Committee**

36.     The Audit Committee during the Relevant Period included Defendants Glasscock, Bennett, and Hance.  Ianna currently serves on the Committee.

37.     The primary purpose of the Audit Committee is to "review and discuss the annual audited financial statements and quarterly financial statements to be included in Sprint's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with management and the independent registered public accounting firm, including review of Sprint's specific disclosures under "Management Discussion and Analysis of Financial Condition and Results of Operations."

38.     The Charter of the Audit Committee contains specific areas of responsibility, including:

- "Review with Sprint Nextel's general counsel and legal matters that could have a significant impact on Sprint Nextel's financial statements …"

- "Oversee the quality-control process of the independent registered public accounting firm by, at least annually, obtaining and reviewing reports from the independent registered public accounting firm describing the firm's internal quality-control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the independent registered public accounting firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues. At least annually, conduct an evaluation of the independent registered public accounting firm's qualifications, performance and independence, taking into account the opinions of management and the internal audit function. The evaluation of the independent registered public accounting firm will include the review and evaluation of the lead partner of such firm. The Audit Committee will review and discuss with the Board its determinations with respect to the independent registered public accounting firm."

- "Review the impact of pronouncements of the Financial Accounting Standards Board, SEC and other governing or regulating bodies on Sprint Nextel's financial statements."

- "Review the integrity of Sprint Nextel's financial reporting processes, both internal and external, with input from the independent registered public accounting firm and the internal audit function."

- "Receive reports from management regarding all significant deficiencies and material weaknesses in the design or operation of Sprint Nextel's internal control over financial reporting which are reasonably likely to adversely affect Sprint Nextel's ability to record, process, summarize and report financial information."

- "Discuss with management the Chief Executive Officer's and Chief Financial Officer's evaluations of Sprint Nextel's disclosure controls and procedures."

### Duties of the Compensation Committee

39.     The Compensation Committee during the Relevant Period included Defendants Bethune, Hill, and O'Neal.  Nuti currently serves on the Committee.

40.     The Compensation Committee must "review and approve any severance, retention or other termination plans and any severance retention or other termination payments proposed to be made to any current or former principal senior office."

41.     The Charter of the Compensation Committee contains specific areas of responsibility, including:

- "With input from the non-employee Board members who are not members of the Compensation Committee, review and approve Sprint Nextel's goals and objectives relevant to the CEO's compensation, evaluate the performance of the CEO in light of those goals and objectives, and set the annual compensation levels for the CEO based on the Board's and the Compensation Committee's performance evaluations and the Compensation Committee approved compensation principles."

- "Review and approve any proposed employment agreement (including any amendments) with principal senior officers. The Compensation Committee will review and approve any severance, retention or other termination plans and any severance, retention or other termination payments proposed to be made to any current or former principal senior officer, except for any such payment made in accordance with a plan or agreement previously approved by the Board or the Compensation Committee."

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

42.     In committing the wrongful acts alleged herein, the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and

conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breach of their respective duties.

43.    During the Relevant Period, the Defendants collectively and individually initiated a course of conduct that was designed to and did:  (i) conceal that most of the "growth" in Sprint's CDMA business was actually due to pre-existing iDEN customers switching to CDMA; (ii) conceal that Sprint would be unable to successfully integrate the CDMA and iDEN networks as promised, including by completing the migration of the Company's customer base to a uniform billing platform by 2007; (iii) conceal the Company's failure to address and resolve its customer service issues; (iv) conceal that the Company was not adequately reserving for goodwill associated with Nextel in violation of GAAP; (v) conceal that the Company was not adequately reserving for loan losses related to subprime subscribers in violation of GAAP; and (vi) deceive the shareholders of Sprint while in possession of non-public information regarding the Defendants' management of Sprint's operations, the Company's financial health and stability, and its future business prospects that were repeatedly misrepresented by Defendants.

44.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of state law, including breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; and to conceal adverse information concerning the Company's future earnings outlook.

45.    The Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by purposefully or recklessly releasing improper statements on the Company's behalf.  Because the actions described herein occurred under the Board's authority, each of the

Directors except Hesse, Ianna, Nilsson, and Nuti was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DEFENDANTS BREACH THEIR FIDUCIARY DUTIES

47.     Defendants, by their fiduciary duties of care, good faith, and loyalty, owe to Sprint a duty to insure that the Company's public filings and statements fairly represent the operations and business prospects of the Company.  In order to adequately carry out these duties, it is necessary for the Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

48.     This material, non-public information principally concerned Sprint's misleading statements regarding the Company's growth expectations and their purported post-merger efficiencies.  The Defendants owed a fiduciary duty to Sprint to ensure that Sprint's Relevant Period statements properly disclosed all material facts concerning the Company.

49.     On October 26, 2006, the Defendants caused Sprint to issue a press release reporting its financial results for the third quarter 2006.  In this release, the Defendants touted "progress on margins, merger integration and operational improvements to enhance competitive position" and revenues of $9.1 billion, an increase of 12% from the third quarter 2005.  CEO Forsee also claimed that the Company benefited from "merger synergies."  The release specifically stated:

Sprint Nextel Corp. (NYSE:S) today reported third quarter 2006 financial results. In the quarter, the company improved profitability and launched several initiatives to enhance operating performance.

For the quarter, diluted earnings per share (EPS) from continuing operations were 8 cents, compared to 12 cents per share for the third quarter 2005. The reported earnings include charges of 2 cents for special items and 22 cents for merger and acquisition-related amortization cost. For the quarter, Adjusted EPS before Amortization*, which removes these effects, increased 7% to 32 cents per share, versus pro forma Adjusted EPS before Amortization* of 30 cents in the year-ago period. Third quarter results reflect growth in operating income from the Wireless segment, offset by a lower contribution from Long Distance.

In the current quarter, the company reported consolidated revenue of $10.5 billion, an increase of 8% compared to pro forma revenues in the 2005 third quarter. Consolidated Adjusted OIBDA* of $3.4 billion increased 14 percent compared to the third quarter of 2005 pro forma results. In the quarter, the company reported a 38.4% Adjusted OIBDA margin* in the Wireless segment and a Consolidated Adjusted OIBDA margin of 34.8%, a 150-basis point improvement from the year-ago period. Third-quarter Consolidated Free Cash Flow* was $769 million.

Total wireless net subscriber additions were 233,000 for the quarter due to growth in CDMA post-paid subscribers, a gain in Boost pre-paid service subscribers and renewed growth in wholesale subscribers, offset by a decline in iDEN post-paid subscribers. At the end of the quarter, Sprint Nextel's total base was 51.9 million subscribers.

In the third quarter, Wireless data revenues increased 74% compared to the year-ago period. Long Distance IP services increased 26% and Cable Voice over Internet Protocol (VoIP) users served by Sprint Nextel more than doubled from the third quarter a year-ago.

In August, the company initiated its common stock buy-back program which is expected to total up to $6 billion over an 18-month period. In the third quarter, the company acquired 91 million common shares at an aggregate cost of approximately $1.5 billion. The company will vary the amount and timing of its common stock purchases from time to time as the program proceeds.

"In the third quarter, our margins benefited from merger synergies and the scale provided by acquisitions," said Sprint Nextel President and Chief Executive Officer Gary Forsee. "Our profitability in the quarter is encouraging and demonstrates the potential of an asset mix that now is predominantly wireless. In the third quarter we took some actions to improve the quality of the customers coming into our business, and this is constraining our near-term growth. At the same time, we have taken a number of actions we believe will improve our top-line growth performance over time."

50.     Sprint's Form 10-Q filed on November 9, 2006 emphasized Sprint's "more restrictive credit policies," which was put into place under the Defendants' direction.  The Form 10-Q stated in relevant part:

> We have implemented a number of programs in an effort to improve customer retention and lower our rate of churn.  We also have implemented more restrictive credit policies and have distribution of our prepaid services in certain markets, which may adversely impact our ability to attract lower credit quality subscribers and users of prepaid services in the affected markets.

51.     On January 8, 2007, the Defendants caused the Company to issue a press release entitled "Sprint Nextel Provides Update on Financial Outlook and Operating Performance."  The press release reiterated the actions undertaken by the Company, through the direction of Defendants, in 2006 to "designed to improve network performance, raise brand awareness, enhance customer satisfaction, stabilize average customer revenues, reduce churn and increase sales and distribution productivity."  Specifically, the press release stated:

> Based on preliminary data, Sprint Nextel expects to report full-year 2006 consolidated operating revenues of approximately $41.0 billion, while Adjusted Operating Income Before Depreciation and Amortization (adjusted OIBDA) continues to be projected in a range of $12.6 billion to $12.9 billion. Total capital expenditures are estimated to be $7.0 billion to $7.3 billion.

> During the fourth quarter, Sprint Nextel added 742,000 total net subscribers and ended the period with a base of 53.1 million. The fourth quarter net additions include 876,000 from wholesale and affiliates, and 171,000 new Boost customers, which were offset by a decline of 306,000 post-paid subscribers. Post-paid performance in the quarter reflects solid gains in CDMA subscribers, offset by a decline in the iDEN base."

>                  *          *          *

> "Sprint Nextel ended 2006 in a solid financial position," said Gary D. Forsee, the company's chairman and chief executive officer. "We expect our full-year projected financial results will be in line with our prior guidance, and we remain on or ahead of plan in integrating our pre-merger operations, systems and product and service line up."

52.     In addressing the Company's plan to "improve customer satisfaction," the January 8, 2007 press release specifically stated:

Improved Customer Satisfaction

-- The company expects to complete the conversion of its entire customer base to a unified billing platform in 2007 from the multiple legacy platforms in place today.

-- A new call center dedicated to serving Boost customers will be opened and the number of business and consumer centers will be expanded during the year.

-- As part of its efforts to improve customer satisfaction, in the second half of 2006 business and consumer customer service operations were consolidated into one organization, allowing for greater efficiency in supporting the customer experience. New executives have been named to lead customer retention and customer operations activities.

53.     On February 28, 2007, Defendants caused the Company to issue its fourth quarter 2006 year-end earnings results.  On the same day, the Defendants caused Sprint to issue a press release highlighting the purported success that "net subscriber growth on the CDMA platform was solid, with a total of more than 1.3 million net additions from post-paid, wholesale and affiliate subscribers."  The press release stated in relevant part:

"In the fourth quarter, we increased funding of business operations and network investments. We are seeing early returns from these investments as we widen our lead in wireless data services on the CDMA platform and with the iDEN network now delivering substantially improved call quality metrics," said Gary Forsee, Sprint Nextel Chairman and CEO.

54.     On March 1, 2007, the Defendants caused the Company to file its Form 10-K for the year ending December 31, 2006.  In this filing, the Defendants allowed the Company to state that Sprint "tightened Sprint's credit policies for new subscribers of both CDMA and iDEN services." The filing also contended that Sprint's "churn of subscribers of our CDMA services remains high relative to our competitors, in large part due to credit-related deactivations."

55.     On May 2, 2007, the Defendants caused the Company to release its first quarter 2007

earnings results.  The Company was caused to state in relevant part:

> In the quarter, the company added nearly 600,000 net new subscribers, expanded network coverage and capabilities and significantly increased investments in business operations. The company reported strong demand for wireless data services and wireline IP services and achieved a fast start for its PowerSource(TM) handset offering that combines the best push-to-talk, voice and data capabilities on one device. The company also substantially completed a major headcount reduction, continued to build momentum on its planned fourth generation wireless data offering and launched a market trial for a Boost Mobile unlimited local calling plan.

> *          *          *

> "Our plans in 2007 call for a substantial increase in the funding of business operations to build long term growth and profitability," said Gary Forsee, Sprint Nextel chairman and CEO. "We established a quick ramp on these investments in the first quarter to accelerate our progress. These increased commitments, along with notably higher device subsidies to drive acquisition and retention, impacted our profitability in the quarter. However, we are seeing some positive tradeoffs in the form of enhanced competitiveness. Examples include:

> -- Double-digit annual growth in prime credit post-paid acquisitions;

> -- Continuing improvements in the customer experience;

> -- Good progress in integrating our disparate network users through new PowerSource devices and transitioning to a single billing and service delivery platform;

> -- Stronger key brand recognition metrics as a result of an increase in year-over-year advertising spend, and further enhancement of our marketing potential with the announcement of a new advertising agency;

> -- iDEN and CDMA networks now performing at their "best ever" levels; and

> -- Great strides in planning for next generation capabilities, including announcing the market launch schedule for our WiMAX broadband wireless data services.

> "In the quarter, we had solid performance in our CDMA post-paid business, including sequential growth in both gross and net additions and improved customer churn," said Forsee. "We also achieved a stronger Boost Mobile customer gain, continued growth in MVNO channels and good velocity with PowerSource sales. Together, these four lines of business generated 1.3 million net additions during the first quarter. However, these gains were partially offset by a decline in the iDEN

post-paid subscriber base reflecting prior network constraints, which have since been largely mitigated.

"Overall post-paid subscriber retention rates again trended slightly positive in the quarter, and reported net add performance was ahead of expectations. In the quarter, 44% year-over-year growth in wireless data services continued to partially offset voice revenue declines. In the Wireline segment, we reported 28% growth in IP services year-over-year, and increased the number of cable telephony customers we serve by more than 200,000 during the quarter. Over the course of the year, we expect to achieve improving profitability in consolidated results, consistent with our previously announced annual guidance," Forsee said.

56.     On August 8, 2007, Defendants caused the Company to release its second quarter 2007 earnings results.  The Company was caused to state that it "experienced strong post-paid demand on the CDMA platform" and that "these gains were offset by lower demand for iDEN post-paid services."

57.     The foregoing statements regarding the Company's credit policies and customer quality were misleading because the Defendants had not "tightened credit" or "implemented more restrictive credit policies" during the fourth quarter of 2006.  Defendants would later admit that they had actually reversed the credit standards implemented in the earlier part of 2006 and increased credit extended to boost subscriber growth, reduce churn, and inflate APRU through the addition of subprime customers on both the iDEN and CDMA networks.

58.     The foregoing statements regarding the health of the Company's business were also misleading because, as is later revealed, the Defendants would be unable to complete "the conversion of its entire customer base to a unified billing platform in 2007 from the multiple legacy platforms in place," integrate the CDMA and iDEN networks, therefore causing more problems with synergies and customer service, and read other consolidation "merger synergies," which would have a negative effect on the Company's churn rate and financial earnings.

59.     The foregoing statements regarding the Company's financial prospects were also misleading because, as is later revealed, the Defendants were not properly accounting for the Company's repaired goodwill associated with the merger, causing its financial statements to be materially misstated and not in compliance with GAAP.

## THE MISCONDUCT IS REVEALED

60.     On October 8, 2007, Defendants caused Sprint to issue a press release announcing that the Company's President, CEO, and Chairman of the Board, Gary D. Forsee, was "stepping down." In this same press release, Sprint was caused to announce a net loss of approximately 337,000 post-paid subscribers in the third quarter of 2007.

61.     An article in the New York *Times* on October 9, 2007, discussing Gary Forsee's departure and dismal third quarter results, stated that:

> Analysts attribute Sprint's problems and Mr. Forsee's departure to the poorly executed union of Sprint and Nextel Communications, a deal struck in 2005.
>
> The Sprint and Nextel networks operated on different wireless technologies, which made it harder to merge operations.
>
> "When Sprint bought Nextel, it was like buying a completely alien technology with no synergy at all," said Edward Snyder, a telecommunications industry analyst with Charter Equity Research. But, he noted, Sprint figured "everybody else was merging, why not them?"
>
> The two companies also had different marketing strategies. Nextel sought more business clients, while Sprint focused primarily on consumers. After the merger "there was a tremendous amount of brand confusion," said Walter Piecyk, an industry analyst with Pali Research.
>
> Mr. Piecyk said that problems were widespread within Sprint. In its wireless business, which is the future of a telecommunications company, Mr. Piecyk said the network needed improvement and customer service was poor. The cost of acquiring new customers has been rising as well.

62.     A MarketWatch.com report on October 9, 2007, reiterated these issues, stating:

> Former Chief Executive Gary Forsee is out of a job because he couldn't keep customers happy. … The problems can be traced to Sprint's $35 billion purchase of

Nextel in 2005, championed by Forsee. Efforts to combine Sprint and Nextel ran into frequent obstacles, leading to increased service disruptions and the defection of 1 million premium customers over the past year.

*     *     *

Improving Sprint's performance, at least against its chief rivals, won't be an easy task in the ultra-competitive wireless industry. AT&T Inc. and Verizon Wireless, the two largest U.S. mobile carriers, appear to be firing on all cylinders and other vendors such as T-Mobile USA Inc. are snapping at Sprint's heels.

*     *     *

The first order of business is to minimize service disruptions for customers when they make calls on the Sprint or Nextel networks. Sprint consistently ranks at the bottom of customer-satisfaction surveys and its 2%-plus churn rate is the highest in the industry. Churn measures the percentage of customers who cancel service.

"They've got to focus," said wireless consultant Jane Zweig of The Shosteck Group, an early critic of the Sprint-Nextel merger. "They are not doing anything well."

The problems run deep. Sprint and Nextel use different technologies to run their networks, target different customers and operate with different corporate cultures.

One of the biggest drags on Sprint is the continued cost of running two networks. Sprint uses a wireless standard known as CDMA while Nextel relies on a unique technology known as iDEN.

Attempts to shift iDEN customers to the CDMA network have been too slow and far from seamless. In addition, capacity on the iDEN network has been strained by fast growth in Nextel's prepaid Boost service.

The result: more disruptions and unhappy customers. What's worse, those customers also happen to be the most lucrative in the industry.

*     *     *

"Whoever the new CEO is, he's going to have a big uphill challenge," Zweig said.

63.     Despite Defendant Forsee's responsibility for the losses to the Company, the Sprint Board of Directors allowed Forsee to resign, instead of treating his termination as one for cause. Thus, the Board allowed Forsee to retain over $40 million in compensation for 2007—including nearly $14 million in purported "severance" benefits.  There was no rational business purpose to

25

conferring such largesse on a departing executive who had not benefited but had actively *harmed* Sprint.

64.     On November 1, 2007, Defendants caused the Company to issue its third quarter 2007 financial results, including its earnings results.   In a press release caused filed on the same day, Sprint announced that it was no longer following its 2008 earnings guidance.   The press release stated in relevant part:

> Sprint Nextel Corp. (NYSE: S) today reported third quarter 2007 financial results. Consolidated net operating revenues in the quarter were $10 billion compared to $10.5 billion in the year-ago third quarter. Net income in the quarter was $64 million or 2 cents diluted earnings per share, which compares to $279 million or 9 cents diluted earnings per share (EPS) in the year-ago period. Adjusted EPS before Amortization*, which removes the effects of special items and merger-related amortization costs, was 23 cents in the quarter compared to 32 cents in this quarter of 2006. The decline in earnings is due to a lower contribution from Wireless, partially offset by an improved contribution from Wireline.
>
> The company reported a net decline of 60,000 total wireless subscribers in the third quarter. Overall subscriber results include growth from CDMA post-paid, Boost Unlimited, wholesale and affiliate channels. These gains were offset by declines from iDEN post-paid and traditional Boost pre-paid product lines. In the quarter, post-paid churn was 2.3% on seasonally higher involuntary deactivations and competitive market conditions. The Wireless post-paid ARPU* of a little more than $59 in the quarter continues to be supported by data growth, offset by lower voice contributions.

65.     On November 9, 2007, Defendants caused the Company to file its Form 10-Q for the period ending September 30, 2007.   The Form 10-Q reported Sprint's financial results as announced in the Company's November 1, 2007 press release.   In response to this filing, analysts at Morgan Stanley issued a scathing assessment of Sprint's future prospects.   The Morgan Stanley report, dated November 14, 2007, stated in relevant part:

> Sprint's 10Q commentary indicates that there is little relief in sight.   The company has been plagued by numerous ongoing operational issues, including secular decline in its iDEN business, increasing churn, declining revenues, billing system integration delays and its Clearwire partnership disintegration.   The company has also been burdened with executive turnover which heightens the level of uncertainty on the

direction of the company.  With that said, outlook for 4Q and 2008 is not promising, with little sign of turnaround."

66.    On December 18, 2007, Hesse was announced as being Sprint's new President and CEO.  In a press release, Hesse conceded that "clearly we must improve execution across the board."

67.    As noted by The Wall Street Journal on December 18, 2007:

Sprint Nextel shares have plummeted nearly 50% since the Sprint-Nextel deal closed in August 2005. Putting together the companies' disparate networks and cultures has proven a trickier task than their directors and executives anticipated, and many customers have defected as a result.

68.    On January 18, 2008, Defendants caused the Company to issue a press release announcing Sprint's fourth quarter subscriber results and a plan to "Streamline Operations."  One aspect of the plan to "streamline operations," as announced in the January 18, 2008 press release, was to lay off employees and record a non-cash impairment charge related to goodwill in the fourth quarter of 2007.  Specifically, the release stated "anticipating continued downward pressure on subscriber trends, revenues, and profitability in 2008, Sprint Nextel also announced initial plans to streamline the business in the coming months.  These plans call for job reductions across the company."  The press release further stated in relevant part:

Sprint Nextel is currently performing its annual assessment of the goodwill recorded on its financial statements and expects to conclude this process prior to the release of its fourth-quarter earnings report. Given current market conditions, particularly the recent decrease in the company's stock price, Sprint Nextel could determine that it will record a non-cash impairment charge related to goodwill in the fourth quarter 2007. Any such charge would have no affect on either the company's current cash balance or future cash flows.

69.    That same day, MarketWatch.com reported on the Company's January 18, 2008 press release:

The company has been hurt by a reliance on credit-risky subscribers, mediocre customer service and a less attractive roster of handsets compared to competitors such as AT&T Inc., the exclusive provider of the iPhone.

In the fourth quarter, Sprint lost 109,000 subscribers overall and 683,000 postpaid customers -- larger than Wall Street analysts expected. Postpaid customer, who sign up for annual plans and pay at the end of each month, are considered the most valuable in the industry.

\*       \*       \*

Churn, or the number of customers who cancel service, remained stubbornly high at 2.3% in the fourth quarter.

Part of the reason was that Sprint has been culling out customers who've had trouble paying their bills. Sprint relied too much in the past on credit-risky consumers to generate growth and management has been taking steps to limit the company's exposure.

\*       \*       \*

Sprint ended 2007 with 53.8 million wireless customers, barely higher than the 53.1 million it served at the end of 2006. AT&T and Verizon, by contrast, added millions of new customers.

Market leader AT&T, for instance, gained a net 4.7 million mobile customers through the first three quarters of 2007 to 65.7 million. In the same time frame, Verizon added 4.6 million mobile subscribers to 63.7 million.

What's worse, the number of postpaid subscribers served by Sprint fell by 1 million in 2007 to 40.8 million.

70.      The Company's problems were discussed in a New York *Times* article published the next day, on January 19, 2008:

Industry analysts had estimated that in the fourth quarter Sprint lost about 350,000 contract subscribers — a carrier's most valuable customers, signed up for contracts of a year or more. Instead, Sprint announced that it had a net loss of 638,000 contract customers.

"It's the magnitude of the weakness that is shocking," said Michael Nelson, an analyst at the Stanford Group, an investment firm.

To reduce costs, Sprint said it planned to cut its payroll by 4,000 workers. The company, based in Reston, Va., currently has about 60,000 employees.

Sprint said it would also close 125 company-owned retail stores, about 8 percent of the nearly 1,400 in the Sprint chain. The total labor savings, the company said, should be $700 million to $800 million a year.

\*       \*       \*

Cutting costs at Sprint, analysts say, is a logical step, given the decline in business. But they say the company must address other fundamental issues — some unresolved since Sprint completed its $35 billion purchase of Nextel in 2005. The company, the analysts say, runs two networks that use different technologies, and making the transition to a single compatible technology is proving to be more time-consuming and costly than expected.

Sprint, Mr. Nelson said, has also not settled on a consistent marketing strategy. By contrast, he said, Verizon has successfully promoted the quality of its network with advertisements that include the catchphrase "Can you hear me now?"

And AT&T has carved out a position as offering a reliable network and stylish handsets. It was the first to offer Motorola's Razr and, later, Apple's iPhone.

"But Sprint has not come up with a broad enough marketing strategy to appeal to a mass consumer audience yet," Mr. Nelson said.

71.     Upon this news and over concerns about a lack of visibility of the company's performance going forward and financial and operating results, Fitch Ratings downgraded Sprint's credit ratings on its long-term debt to junk status and place the Company on rating watch negative. Rating agency Standard & Poor's took a similar rating action a mere three days later on January 22, 2008.   Within three days of Defendants causing Sprint to announce its plans to "streamline operations," two of the largest rating agencies lowered Sprint's debt rating to "junk" status.

72.     On January 31, 2008, in a Form 8-K, the Defendants caused the Company to announce that Sprint would record a material, non-cash impairment charge that would represent "a substantial portion, and potentially all, of the goodwill recorded on its balance sheet at the conclusion of the second test of the goodwill assessment."  The 8-K stated in relevant part:

Sprint Nextel is required to assess goodwill for impairment annually under generally accepted accounting principles. This assessment occurs during the fourth quarter of each calendar year.

The annual goodwill impairment assessment consists of two tests. Sprint Nextel first tests goodwill for impairment by comparing the fair value of the wireless reporting unit with its net book value. If the fair value of the wireless reporting unit exceeds its net book value, goodwill is not impaired, and no further testing is necessary. If the net book value of the wireless reporting unit exceeds its fair value, Sprint Nextel must perform a second test to measure any impairment charge.

Sprint Nextel has completed the first test of its annual goodwill impairment assessment. The results of the first test have been reviewed and discussed by management and the audit committee of the board of directors. On January 30, 2008, management concluded that the net book value of the wireless reporting unit exceeds its fair value; therefore, Sprint Nextel must perform the second test of the goodwill impairment assessment.

To measure the amount of any impairment charge under the second test, Sprint Nextel must determine the implied fair value of goodwill. Specifically, Sprint Nextel must make a hypothetical allocation of the fair value of the wireless reporting unit among all of the tangible and intangible assets and liabilities of that unit, including any unrecognized intangible assets, to determine the implied fair value of goodwill. If the implied fair value of goodwill is less than the approximately $31 billion of goodwill currently recorded on its balance sheet, Sprint Nextel must record an impairment charge for the difference.

Based on the work completed to date, Sprint Nextel will be required to record a material, non-cash impairment charge that will represent a substantial portion, and potentially all, of the goodwill recorded on its balance sheet at the conclusion of the second test of the goodwill assessment. That charge, which will be reported in its fourth quarter 2007 financial results, will not impact Sprint Nextel's current cash balance or future cash flows, or result in a violation in any covenant of any of Sprint Nextel's debt instruments.

73.     On February 28, 2008, Defendants caused the Company to issue a press release announcing Sprint's fourth quarter and full year 2007 financial results.  The release confirmed that Sprint recorded a goodwill impairment charge of $29.7 billion in the fourth quarter of 2007.  Equally shocking, Sprint announced that it would be suspending its dividend payments "for the foreseeable future."  The press release stated in relevant part:

"The fourth quarter financial results reflect the challenges facing our Wireless business," said Dan Hesse, Sprint Nextel CEO. "We are making significant changes across the organization in an effort to improve execution, stabilize our customer base and deliver on the opportunity provided by our assets. Given current deteriorating business conditions, which are more difficult than what I had expected to encounter, these changes will take time to produce improved operating performance, and our near-term subscriber and financial results will continue to be pressured. Additionally, in light of current capital market conditions, we are taking steps to increase our financial flexibility and mitigate refinancing risk by borrowing funds from a revolving credit facility and discontinuing declaring a dividend for the foreseeable future."

74.     In response to this news, on February 28, 2008, S&P Ratings placed the Company's corporate rating and all other ratings on CreditWatch with negative implications.  "The erosion in Sprint Nextel's subscriber base and the resultant decline in EBITDA are substantially higher than we anticipated and the company's business profile is probably no longer supportive of an investment-grade rating," said S&P's credit analyst Allyn Arden.

75.     According to MarketWatch.com, in a conference call with analysts that same day, February 28, 2008, Hesse admitted that the Company faced serious problems and that management had previously "never let investors or analysts onto the true depth of the company's problems." The article stated:

> On Thursday, the struggling wireless-phone carrier admitted it has a big problem. Namely, that lots of customers dislike its service. New Chief Executive Dan Hesse was unusually blunt in a conference call with analysts detailing the company's myriad woes.
>
> He gets high marks for honesty, but the road to recovery doesn't have short detours. The problems at Sprint - dating to the $35 billion acquisition of Nextel in 2005 - were at least three years in the making. It could take just as long to fully repair the damage.
>
> Poor customer service, uneven network quality, lackluster choice of phones and bureaucratic inertia or infighting have all contributed to the company's deteriorating health. This is most evident in the company's stock price, which has lost more than half its value since last summer.
>
> *     *     *
>
> Hesse is not in denial like the former management team, which never let investors or analysts onto the true depth of the company's problems.
>
> *     *     *
>
> To cite one example, former executives always played down independent consumer-satisfaction surveys that showed Sprint with one of the worse records in the industry. Hesse on Thursday open acknowledged the results of those surveys.
>
> "This has hurt our brand," he said.

76.     On February 29, 2008, Defendants caused the Company to file its Form 10-K for the period ending December 31, 2007.  In the 10-K, Defendants revealed the extent of Sprint's problems which stemmed from the Company's prior reliance on subprime customers, a policy implemented under Defendants control of the Company.  Further disclosed in the 10-K by Defendants was the scope of Defendants' failure to successfully merge Sprint and Nextel.  The Form 10-K revealed that Sprint lost 683,000 post-paid subscribers in the fourth quarter of 2007 and divulged that 686,000 post-paid subscribers left the iDen network, while there were only 3,000 additions to the CDMA network, down more than 99% from the prior year.

77.     In addressing the issue of iDEN losses in 2007, the Form 10-K for the period ending December 31, 2007 stated that such loses were the result of "consumer sentiment regarding the iDEN network, reduced marketing programs and limited new handset offerings."  Nowhere within the Form 10-K did the Defendants attribute the 2007 iDEN losses to heightened credit standards. Moreover, the 10-K further acknowledged, for the first time, that the Company "increased credit extended in early 2007 and 2006" and "earlier in the year, we adjusted our credit policy in certain markets in an effort to attract new subscribers.  In late 2007, we adjusted our credit policies and returned to policy standards similar to those in mid-2006, which also contributed to the decline in subscriber additions."

## DERIVATIVE ALLEGATIONS

78.     Plaintiff brings this action derivatively in the right and for the benefit of Sprint to redress injuries suffered, and to be suffered, by Sprint as a direct result of the violations of state law, including breaches fiduciary duty, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof, by Defendants.

79.     Sprint is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

Plaintiff was a shareholder of Sprint at the time of the transactions complained of.  Plaintiff will adequately and fairly represent the interests of Sprint and its shareholders in enforcing and prosecuting their rights.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

80.    The wrongful acts complained of herein subject, and will continue to subject, Sprint to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

81.    The wrongful acts complained of herein were unlawfully concealed from Sprint's shareholders.

## **DEMAND FUTILITY**

82.    Plaintiff has not made any demand on the Board of Sprint to institute this action since such demand would be a futile and useless act because the wrongful acts complained of show an abdication by Defendants of their fiduciary duties of due care and oversight.  Such abdication included, but was not limited to:

(a)    allowing the Company to become engaged in and/or suspected of potentially illegal and fraudulent activities;

(b)    allowing knowingly false material representations to be made to federal regulatory and law enforcement officials so as to induce them to approve the merger; and

(c)    allowing the Company's financial statements to be artificially inflated.

83.    Plaintiff has not made any demand on shareholders of Sprint because such demand would be similarly futile.  As a widely-held public company, Sprint has nearly 3 billion shares outstanding; identifying and making demand on the hundreds of thousands, if not millions, of shareholders who own these shares would be impossible for Plaintiff, both as a matter of practical reality and in terms of financial cost.

84.     The misconduct of the Directors alleged herein was not, and could not have been, the product of a valid or good faith exercise of business judgment.

85.     Whenever a director is entrusted to make a decision about a corporate transaction in which that director has a financial interest, the entire fairness doctrine is triggered.  That doctrine carries a presumption that the transaction was accomplished to favor the interests of the director over the corporation, and the director carries the burden of demonstrating that the transaction was actually entirely fair to the corporation.  Given that presumption and burden shifting, the business judgment rule is rebutted, and demand is not required.

86.     As detailed above, the Directors were directly involved in the misconduct challenged in this action, by virtue of their respective positions on the Board and its Committees.  The Directors abdicated their responsibility to oversee the Company's operations and instead directed and encouraged management, in the service of its own personal gain, to engage in illegal and/or improper conduct that rendered the Company's discussions with federal regulatory and law enforcement officials deceptive.  The Directors' conduct lacked any legitimate business purpose and was not a product of a valid exercise of business judgment.  As such, demand is excused as futile.

87.     Moreover, while Sprint and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped millions of dollars of regular and bonus compensation as a result of their incompetent performance and deceptive activities, and demand on them is therefore excused.

88.     The Audit Committee of Sprint during the Relevant Period included Defendants Bennett, Hance, and Glasscock.  As such, they were responsible for reviewing and approving

Sprint's quarterly and annual filings with the SEC, as well as press releases. By virtue of these facts, these Defendants face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, good faith, and due care to Sprint. The Audit Committee met frequently during the Relevant Period, and these Defendants could not have failed to become aware of the disparity between Sprint's public statement and its actual results—including the failure to write down good will as necessary to keep Sprint's records accurate. While conscious of these disparities, these Defendants nonetheless directed Sprint *not* to write down its good will and *not* to correct its (and other Defendants') false public statements. These actions constituted acts of disloyalty, conscious wrongdoing, and bad faith.

89.     The Compensation Committee of Sprint during the Relevant Period included Defendants Hill, Bethune, and O'Neal. As such, they were responsible for setting Sprint's compensation and retention policies for senior executive officers. Together with the Directors on Audit Committee, these Directors were also responsible for ensuring that compensation decisions did not upset the financial reporting and integrity of Sprint. The Defendants who served on these two Committees—Bennett, Hance, Glasscock, Hill, Bethune, and O'Neal—face a substantial likelihood of liability for breaching their fiduciary duties of loyalty, good faith, and due care to Sprint. Both the Compensation Committee and the Audit Committee approved the decision to allow Defendant Forsee to be terminated voluntarily, instead of "for cause"—ensuring that as his reward for ruining the Company's financial soundness he would walk away with over $40 million total for 2007, including approximately $14 million in purported "severance" benefits. These "severance" benefits were, in reality, nothing but largesse and pay-off to a former insider for no rational business purpose in the circumstances. These actions constituted acts of disloyalty, conscious wrongdoing, and bad faith.

90.     Defendant Hance is further incapable of objectively considering demand because he is, for all intents and purposes, a professional Board member—sitting simultaneously on the Boards of no less than five public companies:  Sprint, Cousins Properties Inc., Duke Energy Corporation, Ford Motor Co., and Morgan Stanley.  This voluminous "portfolio" of engagements not only prevents Hance from diligently attending to his fiduciary duties at any one company (including Sprint), it also gives him a vested interest in *not* acting (and not even being perceived as acting) to demand accountability from fellow directors at any company (including Sprint), much less to assert legal claims against such directors, lest his livelihood and future earnings be jeopardized.

91.     For similar reasons, Defendants Bennett and Glasscock have a vested interest in not being perceived to act against fellow directors at Sprint.  Glasscock is a director at Simon Property Group, Inc., Sysco Corporation, and Zimmer Holdings, Inc., in addition to Sprint, and all are major, publicly-traded companies.  Bennett is a director at public companies Discovery Communications, Inc., Demand Media, Inc., and Liberty Media Corporation.  Like Hance, Bennett and Glassock are not capable of considering demand objectively.

92.     In addition, and as a result of their concealments and falsifications, many of the directors and managers of Sprint held onto their positions of power, prestige and profit at the Company.  The managers of Sprint obtained millions of dollars of salaries and bonuses which would have been denied them had the truth been disclosed. The directors avoided not only the exposure and embarrassment of their oversight failures, but also continued in their prestigious and profitable positions as directors.

93.     Furthermore, the Sprint Board is still dominated and controlled by the exact same wrongdoers who continue to obscure their own misconduct, and will not take action to protect the

interests of Sprint or its shareholders.  The present Board has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the Sprint Board, including each of the Defendants herein, receive substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of Sprint. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good

faith exercise independent business judgment to determine whether to bring this action against themselves.

94.     As an additional basis for excusing demand, each of the Directors (except Hesse, Ianna, Nilsson, and Nuti) either knew or was reckless or negligent in not knowing of the illegal and improper accounting and disclosure practices that were sanctioned and approved at the Company throughout the Relevant Period.  Those Directors will not now take action against the other Directors or the other Defendants because each actively engaged in or allowed Sprint to mislead the Company shareholders regarding the Company's post-merger growth expectations.

95.     Demand is also excused because the Directors have already failed, in the face of several pending lawsuits, to address the transactions challenged herein.  The Directors have thus been made aware of the improper conduct and have failed to even investigate it.  This repeated resistance to correcting, or even investigating, improper conduct demonstrates that a demand on the Directors to take action would be futile.

96.     Moreover, as an additional reason for excusing demand, each of the Directors (except Hesse, Ianna, Nilsson, and Nuti), as a longstanding director (and, in some cases, officer) of Sprint, had intimate knowledge of all major operations of the Company, and yet he or she participated in the dissemination of material misstatements of the Company's financial information.  Thus, those Directors all have a personal interest in concealing any blame for Sprint's internal control problems, and away from himself or herself for consciously disregarding fiduciary duties.  An investigation or inquiry that spread blame higher up the corporate ladder — to the officers or Directors — would not be in the personal interest of these Directors.  The result of such an inquiry would require them to return valuable but unearned compensation to the Company.

97.     Additionally, each of the Directors except Hesse, Ianna, Nilsson, and Nuti also faces a sufficiently substantial likelihood of liability for the misconduct alleged herein, and, thus, there is a reasonable doubt as to his disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

## COUNT I

### Derivatively Against All Defendants for Breach of Fiduciary Duty

98.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.     The Defendants owed and owe Sprint fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe Sprint the highest obligation of loyalty, good faith, due care, oversight, fair dealing, and candor.

100.    The Defendants, and each of them, violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, fair dealing, and candor.

101.    Each of the Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the growth expectations of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

102.    The Defendants caused or allowed Sprint to lack requisite internal controls, and, as a result, the Company's projections and reported results were based upon defective assumptions, manipulated facts, and/or fraudulent accounting practices.

103.    The Defendants failed to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the Company.

104.    As a direct and proximate result of the Defendants' failure to perform their fiduciary obligations, including their gross mismanagement and abuse of control, Sprint has sustained

significant damages, including the cost of defending against numerous lawsuits. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

105.    The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sprint, for which they are legally responsible. Among the abuses of control were: (i) the Defendants' failure to supervise, and to exert internal controls over, and conscious disregard of responsibilities involving public statements represented to federal regulators, shareholders, and the public; (ii) conferring on Defendant Forsee $14 million in ersatz "severance" benefits and failing to terminate him "for cause"; and (iii) failing to implement a policy against the misuse of material, non-public information such that the insider trading of Defendants Kelly, Arendt, West, and Lorimer could have been detected and prevented.

106.    In addition, by their actions alleged herein, the Defendants, either directly or through aiding and abetting one another, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the public statements of Sprint in a manner consistent with the operations of a publicly held corporation.

107.    As a direct and proximate result of the Defendants' abuse of control, Sprint has sustained significant damages and potentially faces the imposition of monetary damages.

108.    As a result of the misconduct alleged herein, the Defendants are liable to the Company.

**COUNT II**

**Derivatively Against All Defendants for Unjust Enrichment**

109.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.    By their wrongful acts and omissions set forth herein, the Defendants were unjustly enriched at the expense of and to the detriment of Sprint.

111.    Defendants, by virtue of their misconduct, usurped millions of dollars in unearned salaries, "bonuses," stock awards, option awards, retirement benefits, and other emoluments. Additionally, Defendant Forsee usurped $14 million in purported "severance" benefits, and Defendants Kelly, Lorimer, Arendt, and West usurped tens of millions in illicit insider trading proceeds.

112.    Plaintiff, as a shareholder and representatives of Sprint, seeks restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

113.    Plaintiff on behalf of Sprint has no adequate remedy at law.

## COUNT III

### Derivatively Against Lorimer, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal

114.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

115.    Lorimer, Bennett, Bethune, Glasscock, Hance, Hill, and O'Neal were members of the Board of Directors of Sprint and personally approved the Board's decision to allow Forsee to be terminated voluntarily and "not for cause," and to pay him $14 million in putative "severance" benefits.

116.    The decision to pay Forsee such "severance," did not have a rational business purpose and was so one-sided that no person acting in good faith in the pursuit of the Company's best interests would have approved of it in the circumstances.

117.    Plaintiff on behalf of Sprint has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

  A.  Against all of the Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' fiduciary breaches, including damages paid in respect of numerous lawsuits pending against the Company from the Defendants conduct leading Sprint to deceive its shareholders.

  B.  Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Sprint have an effective remedy;

  C.  Awarding to Sprint restitution from the Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

  D.  Directing Sprint to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect Sprint and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies, including measures to:

    1.  Strengthen the Board's supervision of operations and accounting procedures and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.     Permit the shareholders of Sprint to nominate at least three candidates for election to the Board; and

3.     Appropriately test and then strengthen the internal audit and control functions so as to avoid a recurrence of the deceptive dealings with federal law enforcement and regulatory officials set forth herein, and the Company's accounting policies.

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL AND DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby demands a trial by jury of the above-captioned matter and designates the place of trial as Wichita, Kansas.

Dated: July 13, 2011                       Respectfully submitted,

**SHAMBERG, JOHNSON & BERGMAN, CHTD.**

By:  */s/ Lynn R. Johnson*
Lynn R. Johnson, KS #07041
*ljohnson@sjblaw.com*
John M. Parisi, KS #14078
*jparisi@sjblaw.com*
Douglas R. Bradley, KS #23046
*dbradley@sjblaw.com*
2600 Grand Boulevard, Suite 550
Kansas City, MO  64108
Telephone: (816) 474-0004
Fax: (816) 474-0003 Facsimile

**KAHN SWICK & FOTI, LLC**
Lewis S. Kahn (*pro hac vice* application to be filed)
*lewis.kahn@ksfcounsel.com*
Albert M. Myers (*pro hac vice* application to be filed)
*albert.myers@ksfcounsel.com*
Melinda A. Nicholson (*pro hac vice* application to be filed)
*melinda.nicholson@ksfcounsel.com*
206 Covington Street
Madisonville, Louisiana 70477
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Attorneys for Plaintiff*

## VERIFICATION

I, Michael Hartleib, declare under penalty of perjury of the laws of the United States that

I have reviewed the Verified Shareholder Derivative Complaint in the case captioned *Michael*

*Hartleib, Derivatively on Behalf of Sprint Nextel Corporation v. Daniel R. Hesse, et al.*, D.

Kan.., and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to

those allegations of which I have personal knowledge, I believe those allegations to be true.  As

to those allegations of which I do not have personal knowledge, I rely on my counsel and their

investigation and for that reason I believe them to be true.

Michael Hartleib

Date: 7-11-2011